**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) Criminal No. 21-472-RJC |
| vs. | ) |
| | ) Judge Robert J. Colville |
| YADELL ERIC JONES | ) |

**MEMORANDUM OPINION**

Defendant Yadell Eric Jones is charged with one count of possession of a firearm by a convicted felon in violation of 18 U.S.C. § 922(g)(1). Mr. Jones moves to dismiss the Indictment against him arguing, predominately, that § 922(g)(1) is unconstitutional on its face. For the reasons discussed below, Mr. Jones' motion will be denied.

**I.   INTRODUCTION**

   **A.  The Indictment**

On October 26, 2021, a Criminal Complaint was filed against Mr. Jones charging him with violating 18 U.S.C. § 922(g)(1). Crim. Compl., ECF No. 5. Then, on November 10, 2021, a grand jury returned a one-count Indictment against Mr. Jones charging him with that same offense. Indictment, ECF No. 17. The Indictment alleges that Mr. Jones has the following criminal convictions: a 2004 Texas State conviction for possession of between 50 and 2,000 pounds of marijuana; a 2000 Pennsylvania Commonwealth conviction for manufacture, delivery, or possession with intent to manufacture or deliver a controlled substance; and a 1999 Pennsylvania Commonwealth conviction for manufacture, delivery, or possession with intent to manufacture or deliver a controlled substance. *Id.* The Indictment further alleges that each of the above crimes is punishable by a term of imprisonment exceeding one year. *Id.* Count One further charges that, knowing he had these prior convictions, Mr. Jones knowingly possessed: a Glock 43 9mm semiautomatic pistol, bearing serial number BGKH523; a Remington 870 12-guage shotgun,

bearing serial number CC71208B; a Girsan MC 1911 .45 ACP semiautomatic pistol, bearing serial number T6368-19AB01747; and a Taurus PT111G2 9mm semiautomatic pistol, bearing serial number TJ017796. *Id.*

The Government asserts that it is prepared to prove the following facts in support of Count One:

> On October 26, 2021, federal, state, and local law enforcement officers executed federal search warrants for 1206 Bank Street in McKeesport, Pennsylvania, Mr. Jones' person, and his vehicle. When the search warrants were executed, Mr. Jones was lying on a bed in the front room of 1206 Bank Street. While searching the residence, investigators recovered four firearms: (1) a loaded Glock pistol, within inches of where Mr. Jones' was lying in his bed; (2) a loaded shotgun, leaning against the wall approximately 10-12 feet from Mr. Jones' bed; (3) a loaded Girsan pistol in a kitchen cabinet; and (4) a loaded Taurus pistol, with two magazines (one of which was extended), located in the same kitchen cabinet as the pistol. Subsequent investigation determined that the Glock pistol had been stolen.
>
> In addition to the firearms, investigators recovered evidence of narcotics trafficking, to include approximately $10,000 in cash, crack cocaine, compressed powdered cocaine, multiple digital scales, silver weights used to zero scales, a sifter, and inositol, a common cutting agent for processing cocaine.

Resp. 2 (internal citations omitted).

Mr. Jones is accused of violating 18 U.S.C. § 922(g)(1). That statute provides:

> (g) It shall be unlawful for any person—
>
> (1) who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year; . . .
>
> to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

18 U.S.C. § 922(g)(1).

### B. Procedural History

On September 20, 2023, Mr. Jones requested, and the Court permitted him, to proceed *pro se*. ECF No. 86. On November 8, 2023, Mr. Jones moved to dismiss the Indictment against him.

ECF No. 92.  In the motion, Mr. Jones makes four overarching arguments.  First, he argues that the Government lacks jurisdiction to proceed with the case.  Second, he argues that Congress lacks the power to regulate firearm possession in Pennsylvania.  Third, he argues that § 922(g)(1) is unconstitutional on its face.  Fourth, he argues that his rights under the Second, Fifth, Ninth, and Tenth Amendments have been violated.  On November 27, 2023, Mr. Jones filed his Brief in Support of his Motion to Dismiss.  ECF No. 94.

By letter, filed December 8, 2023, Mr. Jones advised the Court that he did not believe his Motion to Dismiss and Brief in Support, which were filed by his standby counsel, were true and correct copies.  ECF No. 95.  The Court entered an Order on December 8, 2023, advising Mr. Jones that to the extent he believed there was anything missing from the documents, he could file a letter advising the Court of the same.  ECF No. 96.  On December 8, 2023, Defendant filed a Motion to Amend/Correct his Brief in Support.  ECF No. 97.  The Motion to Amend/Correct provided the Court with copies of a cover letter and a table of contents for his Brief in Support.  *Id.*  The Motion to Amend/Correct is granted, and the Court considers these documents when deciding Mr. Jones' Motion to Dismiss.

The Government filed its Response in Opposition to the Motion to Dismiss on January 4, 2024.  ECF No. 98.  Mr. Jones filed his Reply on February 5, 2024.  ECF No. 99.  The motion is ripe for decision.

**II. LEGAL STANDARD**

Federal Rule of Criminal Procedure 12(b)(3)(B) provides for the filing of pretrial motions asserting "a defect in the indictment."  Fed. R. Crim. Pro. 12.  "An indictment is defective if it alleges [a] violation of an unconstitutional statute."  *United States v. Ho Ka Yung*, Crim. No. 17–14–LPS, 2018 WL 619585, at *1 (D. Del. Jan. 30, 2018) (quoting *United States v. Dean*, 670 F. Supp. 2d 457, 458 (E.D. Va. 2009)).  A court's "consideration of a challenge under Federal Rule

of Criminal Procedure 12(b)(3)(B) is confined to the facts alleged in the indictment." *United States v. Stock*, 728 F.3d 287, 290 n.1 (3d Cir. 2013) (citing *United States v. Huet*, 665 F.3d 588, 595–96 (3d Cir. 2012); *United States v. Bergrin*, 650 F.3d 257, 265 (3d Cir. 2011)).

### III.   DISCUSSION

As discussed above, Mr. Jones argues that the Indictment should be dismissed because: the Government lacks jurisdiction to proceed with the case; Congress lacks the power to regulate firearm possession in Pennsylvania; § 922(g)(1) is unconstitutional on its face; and his rights under the Second, Fifth, Ninth, and Tenth Amendments have been violated.

#### A.   Jurisdiction

Mr. Jones puts forth the following arguments as to why the Government lacks jurisdiction to proceed with his case and why Congress lacks the power to regulate firearm possession in Pennsylvania.  First, Mr. Jones argues that Pennsylvania law, specifically Section 6120(a) of the Pennsylvania Uniform Firearms Act (1995), "preempts the Federal Government from regulating firearm possession in Pennsylvania."  Br. in Supp. 4.  Second, Mr. Jones argues that the Supreme Court's Opinion in *United States v. Cruikshank*, 92 U.S. 542 (1875), is the controlling law arguing that the Supreme Court held that the Second Amendment cannot be infringed by Congress.  Third, Mr. Jones argues that the Commerce Clause is not the appropriate authority for determining jurisdiction.  The Court will address Mr. Jones' arguments in turn.

As to Mr. Jones' argument that Pennsylvania law preempts the Federal Government from regulating firearm possession in Pennsylvania, the Court begins by finding that Mr. Jones' understanding of the preemption doctrine is simply incorrect.  "The Supremacy Clause of the United States Constitution, U.S. Const. art. VI, cl. 2, invalidates state law that 'interferes with or is contrary to federal law.'"  *Farina v. Nokia Inc.*, 625 F.3d 97, 115 (3d Cir. 2010) (quoting *Free v. Bland*, 369 U.S. 663, 666 (1962)).  Therefore, there is no basis by which state law can preempt

federal law. *See United States v. Craig*, Criminal No. 21-338, 2024 WL 449386, at *3 (W.D. Pa. Feb. 6, 2024). Therefore, the Court will not address any further arguments from Mr. Jones concerning the preemption of federal law by Pennsylvania law.

Next, Mr. Jones argues that *Cruikshank* is the controlling law concerning the Government's jurisdiction over this case and Congress' authority to regulate firearm possession. As explained by Judge Porter in his concurrence in *United States v. Range*, 69 F.4th 96 (3d Cir. 2023) (en banc) (Porter, J., concurring), "Congress was powerless to regulate gun possession and use" before the New Deal Revolution. 69 F.4th 96, 108 (citing *Cruikshank*, 92 U.S. at 553 for the proposition that Congress lacked the power to infringe the right declared by the Second Amendment). Judge Porter went on to state that:

> A New Deal Era attempt at federal gun control is revealing. In 1934, the Roosevelt Administration proposed the National Firearms Act to address the gangster-style violence of the Prohibition Era by reducing the sale of automatic weapons and machine guns. Stymied by the federal government's lack of police power, Attorney General Homer Cummings urged Congress to regulate guns indirectly through its enumerated taxing power. Nicholas J. Johnson, *The Power Side of the Second Amendment Question: Limited, Enumerated Powers and the Continuing Battle Over the Legitimacy of the Individual Right to Arms*, 70 Hastings L. J. 717, 750–58 (2019). Congress accepted that suggestion, avoiding the acknowledged constitutional problem by imposing a tax—rather than a direct prohibition—on the making and transfer of particular firearms. *See* National Firearms Act, ch. 757, Pub. L. No. 73 474, 48 Stat. 1236 (1934) (current version at 26 U.S.C. § 5801 et seq.).
>
> The landscape changed in 1937, when the Supreme Court adopted an expansive conception of the Commerce Clause. *See NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893 (1937). Newly empowered, Congress promptly enacted the Federal Firearms Act of 1938. For the first time, that law disarmed felons convicted of a "crime of violence," which the Act defined as "murder, manslaughter, rape, mayhem, kidnapping, burglary, housebreaking; assault with intent to kill, commit rape, or rob; assault with a dangerous weapon, or assault with intent to commit any offense punishable by more than one year." Federal Firearms Act, Pub. L. No. 75–785, 52 Stat. 1250 (1938). In 1961, Congress extended the firearms disqualification to all felons, violent or otherwise. *See* An Act to Strengthen the Federal Firearms Act, Pub. L. No. 87-342, 75 Stat. 757 (1961); *see also* 18 U.S.C. § 922(g)(1).

*Id.* at 107-08.

Therefore, based upon a simple review of precedential decisional case law authority, separate from constitutional considerations addressed below, it is clear that firearm regulation is a valid exercise of the Government's power and *Cruikshank* is not the controlling law for determining the Government's jurisdiction over this case and Congress' authority to regulate firearm possession.

Turning to Mr. Jones' third argument, the Commerce Clause is the applicable authority for determining whether § 922(g)(1) is a lawful exercise of Congress's power to regulate firearms. Mr. Jones argues that the Court should follow "the original Commerce Clause jurisprudence, as defined in *Gibbons v. Ogden*, 22 U.S. 1 [(1824)]" because "it is in harmony with the Constitution and [Mr. Jones'] self-titled 'firearm test.'"  Br. in Supp. 7.  Mr. Jones further argues that *Scarborough v. United States*, 431 U.S. 563 (1977), is inconsistent with *Gibbons* and does not pass constitutional muster.

To begin, the Court has no understanding of what Mr. Jones' "firearm test" is or what authority Mr. Jones relies on in the creation of his "firearm test."  Further, despite Mr. Jones' arguments that the Court should follow the original Commerce Clause jurisprudence, the Third Circuit has made it clear that § 922(g)(1) is a constitutional exercise of Congress's commerce power.  *United States v. Gateward*, 84 F.3d 670, 672 (1996).  The Third Circuit has repeatedly reaffirmed that decision.  *See United States v. Singletary*, 268 F.3d 196, 204–05 (3d Cir. 2001) ("We considered § 922(g)(1)'s post-*Lopez* constitutionality in *Gateward* and decided in favor of the Government. *Morrison* and *Jones* give no reason beyond what was already present in *Lopez* to conclude that § 922(g)(1) lies beyond Congress' Commerce Clause power. Indeed, our conclusion in *Gateward* was uniformly shared by eight other circuits at the time of that decision."); *United*

*States v. Penn*, 870 F.3d 164, 165 n.2 (3d Cir. 2017) (noting that the defendant's challenge to the constitutionality of § 922(g)(1) was foreclosed by *Singletary*).

### B.  Facial Challenge

Next, the Court will address the facial challenge to § 922(g)(1) raised by Mr. Jones. "A facial attack tests a law's constitutionality based on its text alone and does not consider the facts or circumstances of a particular case." *United States v. Marcavage*, 609 F.3d 264, 273 (3d Cir. 2010). "A party asserting a facial challenge must establish that no set of circumstances exists under which the Act would be valid." *United States v. Mitchell*, 652 F.3d 387, 405 (3d Cir. 2011) (cleaned up).

Precedent regarding facial attacks in this Circuit clearly places the burden on Mr. Jones to show that no set of facts exists under which § 922(g)(1) could be constitutionally applied. However, that standard is arguably inconsistent with the standard set forth by the Supreme Court in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1 (2022). *Bruen*, itself a facial challenge to a New York public-carry licensing law, places the burden on the government to establish the validity of its regulations by showing a history and tradition of similar regulations. Applying *Bruen*, the Fifth Circuit has decided facial attacks under the Second Amendment by requiring the government to justify a regulation based on history and tradition. *See United States v. Rahimi*, 61 F.4th 443, 453–54 (5th Cir. 2023) (applying *Bruen*'s two-step analytical framework in a facial attack on 18 U.S.C. § 922(g)(8), which prohibits the possession of a firearm by a person subject to a domestic violence restraining order).

The basis for Mr. Jones' facial challenge is that § 921(g)(1) is unconstitutional in all its applications because there is no founding-era history of disarming people convicted of felonies. Therefore, Mr. Jones takes the approach of placing the burden on the Government to justify § 921(g)(1) based on history and tradition.

The Court need not decide in this case who bears the burden in a facial Second Amendment challenge.  As the Court will explain, the Government has met its burden to show that § 922(g)(1) is constitutional as applied to dangerous groups of people and, therefore, is not unconstitutional under all circumstances.  Therefore, even assuming that it is the Government's burden to justify § 922(g)(1) on its face, based on our Nation's history and tradition of firearms regulation, that burden has been satisfied.

      *i.* ***Bruen* Framework**

The Court begins by setting forth the appropriate legal framework.  Before *Bruen*, the Courts of Appeals had assessed Second Amendment claims using a two-step test that "combine[d] history with means-end scrutiny."  *Id.* at 2125.  *See, e.g.*, *United States v. Marzzarella*, 614 F.3d 85, 89 (3d Cir. 2010) ("First, we ask whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee.  If it does not, our inquiry is complete.  If it does, we evaluate the law under some form of means-end scrutiny.  If the law passes muster under that standard, it is constitutional.  If it fails, it is invalid.").

In *Bruen*, the Supreme Court rejected the second step of that test, eschewing means-end scrutiny in favor of a test based on history and tradition:

> [W]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct.  To justify its regulation, the government may not simply posit that the regulation promotes an important interest.  Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation.  Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

*Bruen*, 142 S. Ct. at 2126 (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50 n.10 (1961)).  The new test requires courts "to assess whether modern firearms regulations are consistent with

the Second Amendment's text and historical understanding." *Id.* at 2131. And the burden rests, not on the party challenging the regulation, but on the government.

To apply this new text, history, and tradition test, the *Bruen* Court explained that courts must consider whether the challenged regulation addresses a problem that would have been within the contemplation of the founding generation. For such regulations, the Court prescribed a "straightforward" inquiry:

> [W]hen a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a *distinctly similar* historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment. Likewise, if earlier generations addressed the societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional. And if some jurisdictions actually attempted to enact analogous regulations during this timeframe, but those proposals were rejected on constitutional grounds, that rejection surely would provide some probative evidence of unconstitutionality.

*Id.* at 2131 (emphasis added). The government must therefore justify regulations addressing problems that were imaginable at the founding by pointing to "distinctly similar" regulations in the historical record.

However, the Court recognized that "other cases implicating unprecedented societal concerns or dramatic technological changes" would "require a more nuanced approach." *Id.* at 2132. For regulations addressing problems "unimaginable at the founding," the Court prescribed a flexible inquiry based on analogical reasoning:

> When confronting such present-day firearm regulations, this historical inquiry that courts must conduct will often involve reasoning by analogy—a commonplace task for any lawyer or judge. Like all analogical reasoning, determining whether a historical regulation is a proper analogue for a distinctly modern firearm regulation requires a determination of whether the two regulations are "relevantly similar."

*Id.* Without providing "an exhaustive survey of the features that render regulations relevantly similar under the Second Amendment," the Court noted two metrics that might render a historical analog "relevantly similar" to a modern regulation: "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2132–33. Thus, for distinctly modern regulations, the government must point to historical analogs that burdened the Second Amendment rights in a similar way and for similar reasons.

    **ii.**    **Discussion**

Therefore, the Court must determine whether the Government has carried its burden to show that § 922(g)(1) is consistent with this Nation's history and tradition of firearms regulation. The Court finds that it has.

While the Government's analysis of the history and tradition of firearm regulation is rooted in an argument against an as-applied challenge to § 922(g)(1), the Court finds that the analysis put forth by the Government is also applicable in the context of a facial challenge.[1]

The Government points the Court to numerous examples of colonial and early state legislative efforts to categorically disarm religious minorities, loyalists, and other groups perceived as dangerous. *See* Resp. 19-23. This includes pointing the Court to its own opinion in *United States v. Angel Perez*, 2:21-cr-00433, Doc. 126 (W.D. Pa. Oct. 29, 2023), in which the Court conducted an in-depth analysis in finding that "§ 922(g)(1) is consistent with this Nation's history of disarming those groups deemed dangerous to public safety." *Perez*, 2:221-cr-00433, Doc. 126

---

[1] The Government acknowledged that Mr. Jones' Motion to Dismiss set forth only a facial challenge. Resp. 4, n.4. However, in an abundance of caution, the Government addressed an as-applied challenge to § 922(g)(1) as well wherein the Government engaged in an analysis of the nation's history and tradition of firearm regulation. *Id.* The Court agrees with the Government that Mr. Jones is only raising a facial challenge to § 922(g)(1) and will not address whether § 922(g)(1) is constitutional as-applied to Mr. Jones. This is further supported by Mr. Jones' arguments in his Reply Brief where he argued that the Government could not "out of an abundance of caution, proffer[] [its] own argument on an assumption [D]efendant challenged 18 U.S.C. § 922(g)(1) as-applied to his conduct while acknowledging [D]efendant makes only a facial challenge." Reply. 6. This argument makes it clear to the Court that Mr. Jones has not raised an as-applied challenge.

at p. 16. While the Court's analysis in *Perez* was in the context of an as-applied challenge, the Court's analysis first found that § 922(g)(1) was consistent with the history and tradition of firearm regulation concerning groups deemed to be dangerous to public safety before finding that defendant Perez was part of a similar group. *Id.* Therefore, the Court finds that its analysis in *Perez* is instructive here where Mr. Jones has raised a facial challenge, especially given the Government's reliance on similar examples of colonial and early state legislative efforts. In *Perez*, the Court held the following:

> The government has pointed to numerous examples of colonial and early state legislative efforts to categorically disarm religious minorities, loyalists, and other groups perceived as dangerous. *See* Resp. at 9–10. For example, colonies routinely disarmed Catholics, particularly during the Seven Years' War, out of fear that they might take up arms against protestant governments in favor of Catholic France. *See United States v. Jackson*, No. 22-2870, 2023 WL 5605618, at *3 (8th Cir. Aug. 30, 2023) (Stras, J., dissenting from denial of rehearing *en banc*) (discussing the fear of "Protestant colonial governments . . . that loyalty to the Pope would cause Catholics to take up arms for France"); *Range*, 69 F.4th. 123–24 (Krause, J., dissenting) ("The colonies redoubled their disarmament of Catholics during the Seven Years' Wars of 1756–1763."). The Massachusetts and Virginia colonies did so despite providing for "unprecedented protections for colonists' firearm rights" in their colonial charters. *Range*, 69 F.4th at 122.
>
> Following this country's independence from British colonial rule, several states, including Massachusetts, Pennsylvania, and Virginia, disarmed loyalists who refused to swear their allegiance to the nascent United States. *See Jackson*, 2023 WL 5605618, at *4 (Stras, J., dissenting from denial of rehearing *en banc*) ("States like Virginia and Pennsylvania required men above a certain age to swear a 'loyalty oath' to the revolutionary cause. Refusal to do so would result in the loss of arms." (citations omitted)); *Folajtar v. Att'y Gen.*, 980 F.3d 897, 914 (3d Cir. 2020) (Bibas, J., dissenting) ("During the American Revolution, Massachusetts and Pennsylvania disarmed loyalists to the Crown who refused to swear allegiance to the state or the United States to eliminate the opportunity for them to violently protest the actions of the state government." (cleaned up)). Pennsylvania's "statute is especially illuminating because Pennsylvania's 1776 constitution protected the people's right to bear arms." *Range*, 69 F.4th at 125 (Krause, J., dissenting). In addition, various state legislatures disarmed Native Americans and free African Americans, out of fear that they might similarly take up arms in rebellion. *Kanter*, 919 F.3d at 458 (Barret, J., dissenting).

> Of course, none of these laws would pass constitutional muster under modern First Amendment and Equal Protection principles. *Range*, 69 F.4th at 104–05 (observing that "those restrictions based on race and religion now would be unconstitutional under the First and Fourteenth Amendments"). But each of them points in the same direction: the colonies and early state legislatures enjoyed broad—though not unlimited—powers to disarm groups perceived to be dangerous in the name of public safety. *See Folajtar*, 980 F.3d at 914 (Bibas, J., dissenting) ("The touchstone was not virtue, but danger.").
>
> Likewise, § 922(g)(1) bars groups that Congress has deemed dangerous from possessing firearms. Though the statute may be "wildly overinclusive," *Kanter*, 919 F.3d at 466 (Barret, J., dissenting) (quoting Adam Winkler, *Scrutinizing the Second Amendment*, 105 MICH. L. REV. 683, 721 (2007)), its thrust is the removal of weapons from those who may disturb the public peace. For proof, look no further than a related statute, 18 U.S.C. § 925(c). That statute permits those who are barred from possessing firearms under § 922(g)(1) to petition the Attorney General for restoration of their rights to possess, conditioned on a finding that they are not dangerous. 18 U.S.C. § 925(c).[2] If felons can seek exemptions from § 922(g)(1) by showing that they are not dangerous, it stands to reason that § 922(g)(1) is intended to disarm those that are dangerous.

*Perez*, 2:221-cr-00433, Doc. 126 at pp. 14-16.

Therefore, for the same reasons as found by the Court in *Perez*, the Court finds here that § 922(g)(1) is not unconstitutional on its face.

The Court's finding that § 922(g)(1) is constitutional on its face is further supported by the Supreme Court's decisions in *Bruen*, *Heller*, and *McDonald*. The Supreme Court in *Bruen* signaled an answer to the question of whether § 922(g)(1) is consistent with this Nation's historical tradition of firearm regulation. *Bruen* reaffirms the holdings of the Supreme Court in *District of Columbia v. Heller*, 554 U.S. 570 (2008) and *McDonald v. Chicago*, 561 U.S. 742 (2010), "that

---

[2] The reprieve provided by § 925(c) "has been rendered inoperative, however, for Congress has repeatedly barred the Attorney General from using appropriated funds 'to investigate or act upon [relief] applications.'" *Logan v. United States*, 552 U.S. 23, 28 n.1 (2007). While § 925(c) no longer provides those subject to § 922(g)(1) with a meaningful escape valve, § 925(c) still informs the core purpose of § 922(g)(1)—dangerousness.

the Second and Fourteenth Amendments protect the right of an ordinary, law-abiding citizen to possess a handgun."

The Supreme Court in *Heller* made clear that the rights secured by the Second Amendment are not unlimited and in doing so noted the "longstanding prohibitions on the possession of firearms by felons." 554 U.S. at 626 ("Although we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment, nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons"). The Third Circuit has ruled, in line with other Courts of Appeals, that *Heller's* list of presumptively lawful regulations, which includes the prohibition on the possession of firearms by felons, is not dicta. *U.S. v. Barton*, 633 F.3d 168, 171 (3d Cir. 2011), overruled on other grounds by *Binderup v. Attorney General United States of America*, 836 F.3d 336 (3d Cir. 2016).

Further, the Supreme Court in *Bruen* repeatedly re-iterated the rights of "law-abiding" citizens which is consistent with *Heller's* recognition of the exclusion of felons from the protections of the Second Amendment. In their concurrences in *Bruen*, Justices Alito, Kavanaugh, and Roberts repeated their intent to leave undisturbed government regulations prohibiting people convicted of felonies from carrying firearms. *Bruen*, 597 U.S. at 72 (Alito, J., concurring) ("Our holding decides nothing about who may lawfully possess a firearm or the requirements that must be met to buy a gun. Nor does it decide anything about the kinds of weapons that people may possess. Nor have we disturbed anything that we said in *Heller* or [*McDonald*] about restrictions that may be imposed on the possession or carrying of guns."); *id.* at 80 (Kavanaugh, J., joined by Roberts, C.J., concurring) ("Second as *Heller* and *McDonald* established and the Court today again explains, the Second Amendment is neither a regulatory straightjacket nor a regulatory blank

check. Properly interpreted, the Second Amendment allows a variety of gun regulations." (citations omitted)).

While much of this language from *Bruen* concerning a "law-abiding" citizen is dicta, the Court is required to give the Supreme Court's dictum great deference. *See In re McDonald*, 205 F.3d 606, 612-13 (3d Cir. 2000). This is true even considering the Third Circuit's analysis in *Range*, wherein the Third Circuit reasoned that the Federal Firearms Act of 1938 and the 1961 Amendment were not themselves a basis for finding a longstanding tradition of disarming firearms as applied to defendant Range, because the Third Circuit was clear that its decision in *Range* is a narrow one.

Therefore, this Court remains bound by the Supreme Court's decision in *Heller* and its progeny and Mr. Jones' facial challenge to § 922(g)(1) is denied because the Government has met its burden that there is a longstanding history and tradition of disarming groups deemed dangerous to public safety. Therefore, § 922(g)(1) is not unconstitutional in all circumstances. Further, for the reasons stated above, Mr. Jones' Second Amendment rights have not been violated, despite his arguments to the contrary. *See* Br. in Supp. 22-27.

### C. Mr. Jones' Fifth, Ninth, and Tenth Amendment Rights

Finally, the Court addresses Mr. Jones' remaining arguments that his Fifth, Ninth, and Tenth Amendment Rights have been violated. The rights Mr. Jones asserts under the Fifth, Ninth, and Tenth Amendments are all derivative of his Second Amendment rights. Specifically, Mr. Jones argues that his Fifth Amendment rights have been violated because § 922(g)(1) has deprived a category of people (i.e., felons) of life, liberty, and property without due process of law. Br. in Supp. 30. In support of this argument, Mr. Jones "takes issue with the legislative process surrounding the passage of the Gun Control Act of 1968." Resp. 35. As to his Ninth Amendment

rights, Mr. Jones argues that his Second Amendment rights are protected through the Ninth Amendment. Br. in Supp. 28-29. Lastly, as to his Tenth Amendment rights, Mr. Jones argues that Congress violated his Tenth Amendment rights because it overstepped in enacting § 922(g)(1). *Id.* at 32. The Government argues that Mr. Jones' rights have not been violated. *See* Resp. 32-36.

Because, for the reasons set forth above, Mr. Jones' Second Amendment rights have not been violated, there is no violation of the derivative rights Mr. Jones asserts under the Fifth, Ninth, and Tenth Amendments.

### IV.  CONCLUSION

For the reasons set forth above, Mr. Jones' Motion to Amend/Correct his Brief in Support (ECF No. 97) is granted, and the Court considered the additional documents provided by Mr. Jones in deciding his Motion to Dismiss. Further, for the reasons set forth above, Mr. Jones' Motion to Dismiss (ECF No. 92) is denied.

BY THE COURT:

*/s/Robert J. Colville*
Robert J. Colville
United States District Judge

Date: February 26, 2024

cc:   All counsel of record

   Yadell Eric Jones
   71343-509
   Butler County Prison
   202 S. Washington St.
   Butler, Pa 16001